UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| J.A.D., a minor by his mother ) | |
| LENORE N. DEPP, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 1:11-cv-01518-TWP-TAB |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| COMMISSIONER OF THE SOCIAL ) | |
| SECURITY ADMINISTRATION, ) | |
| ) | |
| Defendant. ) | |

**ENTRY ON JUDICIAL REVIEW**

Claimant J.A.D., a minor, by his mother, Lenore N. Depp ("Ms. Depp"), requests judicial review of the final decision of the Commissioner of the Social Security Administration ("the Commissioner") denying his application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("the Act"), 42 U.S.C. § 1382. For the following reasons, the Court **AFFIRMS** the Commissioner's decision.

**I. BACKGROUND**

**A.     Procedural History**

On January 8, 2008, Ms. Depp filed an application for SSI on behalf of her son, J.A.D., alleging a disability onset date of October 5, 2005. (Tr. at 14.) The application was denied initially and upon reconsideration. (*Id*.) J.A.D. then filed a written request for hearing, which was held on May 13, 2010 by Administrative Law Judge Ronald T. Jordan ("the ALJ"). (Tr. at 14, 32.) On September 24, 2010, the ALJ issued a decision that found that J.A.D was not disabled since his application date, and was therefore not disabled under the Act. (Tr. at 26-27.) On October 6, 2011, the Appeals Council denied J.A.D.'s request for review of the ALJ's

decision, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review.  (Tr. at 5-7); 20 C.F.R. § 416.1481.  On November 15, 2011, J.A.D. filed this appeal requesting judicial review pursuant to 42 U.S.C. § 405(g).

**B.     Factual and Medical Background**

    **1.     Asthma and Renal Cyst**

J.A.D. was born February 28, 2005.  At the time of the hearing, J.A.D. was a five-year-old child who attended Fahondzi Daycare for forty hours per week.  (Tr. at 14, 39.)  He has been diagnosed with asthma and a renal cyst, for which he has received treatment.  (Tr. at 17, 171.)

On February 26, 2007, when J.A.D. was almost two years old, he was treated by his primary care physician, John Kunzer, M.D. ("Dr. Kunzer") for an upper respiratory infection.  (T.R. at 169.)  Dr. Kunzer noted that J.A.D. had a previous medical history of asthma and noted that J.A.D. had already been taking Pulmicort and prescribed Albuterol and Pulmicort as needed.  (*Id*.)

On July 5, 2007, when J.A.D. was two years and four months old, he was examined by consulting physician Dr. Sandeep Gupta, M.D. ("Dr. Gupta").  (Tr. at 171.)  Dr. Gupta noted that J.A.D. was having asthma attacks about once a month, precipitated by changes in weather and inter current illnesses.  (*Id*.)  In the report, Dr. Gupta stated the asthma attacks interfered with J.A.D.'s activities, that he took Pulmicort every day, and Albuterol inhaler and mist treatments via a nebulizer as needed.  (*Id*.)  However, Dr. Gupta also noted that J.A.D. had good air entry with clear breath sounds, and that he was doing better recently.  (Tr. at 172.)  Dr. Gupta remarked that the renal cyst was stable in size and apparently not causing any problems.  (Tr. at 171.)  At the time, J.A.D. was also seeing an urologist at Riley Children's Hospital every six months for monitoring the cyst.  (Tr. at 171-72.)  On January 4, 2008, a renal ultrasound

indicated that the cyst was slightly decreased in size in comparison to a previous examination from April 17, 2007.  (Tr. at 176; Tr. at 198.)

Between March 12 and December 2, 2008, J.A.D. was examined and treated on several occasions by various physicians.  (Tr. at 199-203.)  On March 12, 2008, the nurse noted that J.A.D. only had asthma when the weather changed.  (Tr. at 199.)  On March 25, 2008, J.A.D. was treated for asthma by Dr. Patrick Bradshaw ("Dr. Bradshaw"), who noted that J.A.D. used Pulmicort every day, which kept him away from the hospital.  (Tr. at 200.)  On July 2, 2008, Dr. Kunzer noted that J.A.D.'s asthma was "doing good".  (Tr. at 201.)  Lastly, on December 2, 2008, J.A.D. was treated for a cough, congestion, fatigue, and wheezing by Dr. Ira K. Means ("Dr. Means").  (Tr. at 203.)  Dr. Means noted that J.A.D. was "supposed to be on Pulmicort." (*Id*.)

J.A.D. was again examined by Dr. Gupta on April 16, 2008, when he three years and two months old.  (Tr. at 179.)  In the report, Dr. Gupta noted that J.A.D. was having asthma attacks every other week or so, still precipitated by changes in weather and inter current illnesses.  (*Id.*)  Dr. Gupta wrote that the asthma "certainly interferes with his quality of life and the family's quality of life." (*Id.*)  He also stated that J.A.D. had good air entry with clear breath sounds, and that on clinical examination, there were no signs of active diseases or respiratory distress.  (Tr. at 180.)  With regard to the renal cyst, Dr. Gupta remarked that the cyst was not changing in size and not causing any problems, noting that J.A.D. was still seeing an urologist at Riley Children's Hospital every six months.  (Tr. at 179.)

On April 28, 2008, state agency reviewing physician Dr. P. Kelley, M.D. ("Dr. Kelley") determined that J.A.D's impairment or combination of impairments was severe, but did not meet, medically equal, or functionally equal the listings.  (Tr. at 182-83.)  In this decision, Dr. Kelley

3

stated that J.A.D. had no limitation in acquiring and using information, attending and completing tasks, interacting and relating with others, moving about and manipulating objects, or caring for himself. (Tr. at 184-185.) However, Dr. Kelley noted J.A.D. had a less than marked limitation of health and physical well-being, and although J.A.D.'s asthma was still being treated with Pulmicort and Albuterol, he had not been hospitalized, had not had any severe exacerbations in the past year, and on clinical examination, he was not experiencing any problems and his chest exam was normal. (Tr. at 185.)

On August 29, 2008, state agency reviewing physician Steven E. Roush, M.D. ("Dr. Roush") determined that J.A.D's impairment or combination of impairments was severe, but did not meet, medically equal, or functionally equal the listings. (Tr. at 191-92.) Similar to Dr. Kelley, Dr. Roush determined that J.A.D. had no limitation in all domains except health and physical well-being, for which J.A.D. had a less than marked impairment. (Tr. at 193-94.) He noted that J.A.D. had not visited the hospital for severe asthma attacks, had a normal clinical examination and. per his mother, J.A.D.'s asthma was controlled on medication. (Tr. at 194.)

Over a year later, on December 14, 2009, when J.A.D. was four years old, he saw Dr. Mel Gatewood ("Dr. Gatewood"). (Tr. at 204.) Dr. Gatewood noted that J.A.D. had some wheezing when he played, coughed at night, and used Albuterol more with weather changes. (*Id.*) Dr. Gatewood continued J.A.D. on Flovent and Albuterol. (*Id.*) A day later, on December 15, 2009, one of J.A.D.'s daycare teachers, who had observed his breathing and behavior patterns for more than a year, noted that J.A.D. had a wheezing problem when exercising and coughed a lot at naptime. (Tr. at 210.)

At the hearing before the ALJ on May 13, 2010, Ms. Depp testified that J.A.D. had not been to the emergency room in a while, but had been to the Blackburn Health Clinic. (Tr. at 36.)

She also testified that she knew how to notice his asthma attacks and that when his normal medication did not work, "[t]hey [had] to put him on this other medicine for like five days," which got the asthma under control. (Tr. at 37.) Ms. Depp also said that J.A.D.'s asthma was worse when the weather changed and when he played with other children (Tr. at 37-38), but he had not been placed on any physical activity restrictions. (Tr. at 37.) She further testified that J.A.D. was in daycare forty hours per week (Tr. at 39); he had an inhaler and a machine at the daycare, but he only used the machine when she noticed that his asthma was bad. (Tr. at 38.) Ms. Depp later testified that when J.A.D.'s asthma was bad, she might have to give him the treatment four or five times a day to keep it under control. (Tr. at 39.)

### 2. Behavioral Issues and Attention Deficit Hyperactivity Disorder (ADHD)

On several occasions, J.A.D.'s teachers and physicians have noted behavioral problems. On July 2, 2008, Dr. Kunzer noted that J.A.D. was "very hyper, inattentive, and [threw] temper tantrums." (Tr. at 201.) On December 14, 2009, Dr. Gatewood noted that J.A.D. "can't sit still," had a bad temper, and throws things. (Tr. at 204.)

On March 11, 2010, on referral from Dr. Kunzer, J.A.D. was evaluated at the Midtown Mental Health Clinic by social worker Mary Head ("Ms. Head"). (Tr. at 219-20.) Ms. Depp reported to the evaluator that J.A.D. threw a tantrum every morning, was noncompliant with requests, aggressive with siblings and peers, and did not comply with rules or requests at his daycare, where only one staff person could control him. (Tr. at 219.) Ms. Depp also said her son had symptoms of ADHD, including, "difficulty focusing on tasks, hyperactivity, short attention span, distractibility, impulsivity, inability to sit still," and that she had to remind him over and over to do things. (*Id.*) In her assessment report, Ms. Head noted that J.A.D. was pleasant, cooperative, and full of energy, but became restless during the examination and was

noncompliant with his mother's attempts to get him to not bother items in the exam room. (*Id.*) Ms. Head's initial diagnostic impression was ADHD (Tr. at 219), and her treatment plan was to engage J.A.D. in short term therapy to address his anger, aggression, and low frustration tolerance. (Tr. at 220.) She also planned to offer parenting education to J.A.D.'s mother. (*Id.*) The notes further reflect that Ms. Depp made a request that Ms. Head speak with Dr. Kunzer about providing J.A.D. with ADHD medication or a referral. (*Id.*)

On December 15, 2009, Rachel Thomas, J.A.D.'s daycare teacher, evaluated his behavior in a variety of categories, concluding that he was "very often" easily distracted, fidgeted in his seat, ran around or climbed when he was supposed to be seated, had difficulty playing quietly, was "on the go," interrupted others, and had difficulty waiting in line. (Tr. at 212.) On the same day, one of J.A.D.'s other daycare teachers, Gwendolyn White, who had observed his breathing and behavior patterns for more than a year, noted that J.A.D. had a bad temper and was sometimes out of control. (Tr. at 210.) Additionally, at the hearing before the ALJ on May 13, 2010, Ms. Depp testified that J.A.D. had "some signs of ADHD." (Tr. at 40.)

## II. DISABILITY AND STANDARD OF REVIEW

An individual under the age of eighteen (a "child") is disabled if he "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i). To meet this standard, a child must show that (1) he is not engaged in substantial gainful activity; (2) he has a severe medically determinable impairment or combination of impairments; and (3) his impairments meet, medically equal, or functionally equal a Listing found in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. § 416.924(a)-(d). At the third step, if a child's

impairment does not meet or medically equal any Listing, the ALJ must determine whether the child's impairment or combination of impairments functionally equals a Listing by considering how the child functions in six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1)(i)-(vi). When determining if an impairment or combination of impairments functionally equals a Listing, the ALJ will consider the "interactive and cumulative effects of all of the impairments for which [the ALJ has] evidence," including those impairments that are not severe. 20 C.F.R. § 416.926a(a). "To find an impairment functionally equivalent to a [L]isting, an ALJ must . . . find an 'extreme' limitation in one category or a 'marked' limitation in two categories." *Brindisi v. Barnhart*, 315 F.3d 783, 785 (7th Cir. 2003) (citing 20 C.F.R. § 416.926a(a)).

The Social Security Act provides for judicial review of the Commissioner's denial of benefits. 42 U.S.C. § 405(g). This Court will sustain the ALJ's findings if they are supported by substantial evidence. 42 U.S.C. § 405(g); *Nelson v. Apfel*, 131 F.3d 1228, 1234 (7th Cir. 1997). In reviewing the ALJ's findings, the Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the ALJ. *Id.* While a scintilla of evidence is insufficient to support the ALJ's findings, the only evidence required is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). If the ALJ's decision is supported by substantial evidence, it "will be upheld even if an alternative position is also supported by substantial evidence." *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004).

However, the "ALJ's decision must be based upon consideration of all the relevant evidence." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994).

### III. THE ALJ'S DECISION

In his analysis of the three steps, the ALJ determined at step one that J.A.D. had not engaged in substantial gainful activity since January 8, 2008, the application date. (Tr. at 17.) At step two, the ALJ found that J.A.D.'s asthma and renal cyst were severe impairments, but that his possible ADHD was a non-severe impairment. At step three, the ALJ concluded that J.A.D. did not have an impairment or combination of impartments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. Specifically, he determined that J.A.D. did not have the required extreme or marked limitations to meet or medically equal Listings 103.03B or 103.03C (asthma), nor Listing 106.02 (chronic renal disease). Lastly, the ALJ concluded that J.A.D. did not have an impairment or combination of impairments that functionally equaled the listings.

In his discussion of the six domains, the ALJ found that J.A.D. had no limitation on acquiring and using information, no limitation on attending and completing tasks, no limitation on interacting and relating with others, less than a marked limitation on moving about and manipulating objects, no limitation on the ability to care for himself, and less than a marked limitation in health and physical well-being. Accordingly, the ALJ concluded that J.A.D. was not disabled.

### IV. DISCUSSION

J.A.D. makes four arguments that claim the ALJ committed reversible error. He argues the ALJ's decision was not supported by substantial evidence because (1) the ALJ ignored and mischaracterized treatment evidence, (2) the ALJ erred in failing to summon a medical advisor,

and that as a result, (3) fairness and justice require reversal of the decision, and (4) he argues the ALJ's credibility determination was erroneous.

### A. Ignoring and mischaracterizing evidence

#### 1. ADHD (Listing 112.11)[1]

As an initial matter, J.A.D. argues the ALJ ignored or mischaracterized evidence regarding J.A.D.'s possible ADHD. (Dkt. 13 at 12-16.) However, at the second step of his analysis, the ALJ determined that J.A.D.'s possible ADHD was not a severe impairment. (Tr. at 17.) If an impairment is not found to be severe, the ALJ "will determine that [a claimant is] not disabled and not review [his] claim further." 20 C.F.R. § 416.924(a). Thus, by finding that J.A.D.'s possible ADHD was not a severe impairment, the ALJ was not required to consider whether this impairment met or medically equaled Listing 112.11. To conclude otherwise would undermine the importance of the severity determination. *See Bowen v. Yuckert*, 482 U.S. 137, 153 (1987) (affirming the importance of the severity determination).

Here, the ALJ proceeded to step three based on his finding that J.A.D.'s asthma and renal cyst constituted severe impairments. However, this finding does not require the ALJ to then consider whether J.A.D.'s combination of impairments met or medically equaled Listing 112.11. Beyond the second step of the analysis, evidence of a non-severe impairment is only relevant to support a finding of functional equivalence, when the ALJ will consider the "interactive and cumulative effects of all of the impairments for which [the ALJ has] evidence," including those impairments that are not severe. 20 C.F.R. § 416.926a(a). The ALJ *did* consider evidence of J.A.D.'s behavioral issues in his decision on functional equivalence. (*See, e.g.*, Tr. at 23 (noting that reports by Ms. Depp of J.A.D.'s aggression with siblings and peers, along with the daycare

---

[1] The Court notes that J.A.D. has not raised an argument in his Complaint pertaining to his renal cyst. Therefore, the Court will not address the ALJ's findings on this impairment.

9

teacher's report of problems with peer relationships, did not support limitation in the domain of "interacting and relating with others.")).

J.A.D. makes several assertions that his possible ADHD was of sufficient severity, none of which are supported by analysis. First, he asserts that Dr. Kunzer's referral to mental health evaluation demonstrates that the doctor had determined that J.A.D.'s possible ADHD was severe. However, Dr. Kunzer made no determination about J.A.D.'s mental health, but simply referred him to Ms. Head. (*See* Dkt. 22 at 13.) Also, J.A.D. asserts that Ms. Head concluded that J.A.D. needed "significant psychotherapy treatment" (Dkt. 13 at 16), but she only offered to engage him in short term therapy, to offer parenting education to his mother, and to address his mother's request for ADHD medication with Dr. Kunzer.[2] (Tr. at 220.) In light of this evidence, the ALJ found that Ms. Head's assessment did not appear to be a firm, clinically supported diagnosis, and that J.A.D. had not engaged in any treatment for ADHD. Thus, although J.A.D. asserts otherwise, the ALJ made a finding of non-severity based on the relevant evidence in the record and supported his finding with substantial evidence.

**2. Asthma (Listing 103.03C2)**

**i) J.A.D failed to develop his argument that the ALJ erred at step three.**

J.A.D.'s attorney argues the ALJ's decision was not supported by substantial evidence because the ALJ ignored and mischaracterized evidence which proved that J.A.D.'s impairments met, medically equaled, or functionally equaled Listing 103.03C2. In support of this conclusion, he cites a string of medical evidence that the ALJ "selectively considered," or "ignored" and

---

[2] J.A.D. also concludes, without explanation, that Dr. Kunzer's note that J.A.D. was "very hyper, inattentive, [and had] temper tantrums" (Dkt. 13 at 14), Dr. Gatewood's note that he "[c]an't sit still, [has a] bad temper, throws things, [and was] very hyper" (Dkt. 13 at 15), and the daycare teacher's evaluation (*Id.*), prove that his impairments met, medically equaled, or functionally equaled the requirements for Listing 112.11. (*See, e.g.*, *id.*). Without analysis, the Court will not attempt to connect the dots to determine if these assertions are true. *See United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991). Therefore, this argument is waived.

concludes that this evidence was necessary to prove disability under this listing. (*See* Dkt. 13 at 12-16.) However, even if the ALJ ignored this evidence, J.A.D. does not explain how the evidence supports a finding of disability under the listings; he simply recites the language of the listing and concludes that his impairments meet it.

J.A.D.'s counsel has been encouraged by this Court on many occasions to support his argumentation with analysis. *See D.O.B. ex rel. Dudley v. Astrue*, No. 1:10-cv-01142-WTL-TAB, 2011 WL 3739366, at *2 (S.D. Ind. Aug. 3, 2011) (listing cases in which counsel's style of argument has been subject to waiver for lack of development). In other words, J.A.D. bears "the burden of showing that his impairments meet a listing, and he must show that his impairments satisfy all of the various criteria specified in the listing." *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006).

J.A.D. has failed to meet this standard here. He has not offered analysis to show that his impairments meet any of the listings, but merely recites the language of the listings, asserts that the ALJ ignored or mischaracterized certain evidence, and concludes that this evidence was necessary to prove disability under the listings. (*See* Dkt. 13 at 12-16.) These conclusions do not satisfy J.A.D.'s burden to show that his impairments meet all of the various criteria specified in a listing, and the Court will not connect the dots for him. *See Poston v. Astrue*, No. 1:08-cv-1543-JMS-LJM, 2010 WL 987734, at *8 (S.D. Ind. Mar. 15, 2010) ("This method of argumentation is not argumentation at all . . . . The Court cannot and will not forge new arguments for [the Claimant]."). Accordingly, J.A.D.'s arguments that the ALJ mischaracterized and ignored evidence – without himself showing how this evidence proves disability under the listings – are waived. *See United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991) (finding that undeveloped and perfunctory arguments are waived).

### ii)  The ALJ's step three decision is supported by substantial evidence.

Even if J.A.D.'s step three argument is not waived, the ALJ's decision that J.A.D.'s impairments did not meet, medically equal, or functionally equal any of the listings does not constitute reversible error. The ALJ need not provide a written evaluation of each piece of evidence or testimony, but when "the claimant presents considerable proof to counter the agency's position, the ALJ must articulate, at some minimal level, his analysis of the evidence." *Green v. Shalala*, 51 F.3d 96, 101 (7th Cir. 1995).  This allows a reviewing court to "track the ALJ's reasoning and be assured that the ALJ considered the important evidence." *Id.*

#### a.  Met or Medically Equaled Listing 103.03C2

Listing 103.03C2 requires: "[p]ersistent low-grade wheezing between acute attacks or absence of extended symptom-free periods requiring daytime and nocturnal use of sympathomimetic bronchodilators with . . . [s]hort courses of corticosteroids that average more than 5 days per month for at least 3 months during a 12-month period."  20 C.F.R. Part 404, Subpt P, App. 1, § 103.03C.  Notably, J.A.D. never specifically discusses how his impairments meet these requirements.  In several instances, J.A.D. presented evidence to counter the agency's position, and in each instance, the ALJ minimally articulated his analysis of the evidence.  As noted below, the ALJ's analysis of the evidence sufficiently allows this Court to track the ALJ's reasoning and be assured that the ALJ considered a substantial amount of evidence to support his decision.

First, J.A.D. asserts that the ALJ ignored Dr. Kunzer's findings on February 26, 2007 that J.A.D. had a previous medical history of asthma which was treated with the steroid Pulmicort. (Dkt. 13 at 13.)  The ALJ did mention that J.A.D. was seen on this date for an upper respiratory infection, but did not specifically mention asthma and Pulmicort.  However, the ALJ is not

required to provide a written analysis of each piece of evidence. *Green*, 51 F.3d at 101. Further, the ALJ noted elsewhere that J.A.D. was diagnosed with asthma when he was five months old, and that he regularly used inhalers and nebulizer treatments. (Tr. at 18.) In this way, the ALJ considered both supporting and contrary evidence, concluding that the record as a whole did not support a finding of disability.

Additionally, J.A.D. argues the ALJ rejected Dr. Gupta's reports that J.A.D. had asthma attacks "about once a month" and "every other week or so." (Dkt. 13 at 13.) J.A.D. also asserts the ALJ ignored that his attacks were precipitated by changes in weather and inter current illnesses, and that they were usually treated at home with steroid medications. (*Id.*) However, the ALJ discussed Dr. Gupta's reports at length, noting that the doctor found "good air entry bilaterally with clear breath sounds; no retractions; and no flaring," and "found no signs of active disease or respiratory distress on clinical examination." (Tr. at 18.) Also, the ALJ stated that the findings regarding the frequency of J.A.D.'s attacks were based on the medical history communicated by his mother. (*Id.*) According to the ALJ, "the medical record [did] not support continued asthma attacks of such frequency" (*Id.*), and in his credibility determination, the ALJ found that the allegations made on J.A.D.'s behalf were not fully credible. (Tr. at 20.) Drawing on the record as a whole, the ALJ noted that J.A.D.'s mother reported that he only had asthma when the weather changes, that one attending physician noted that J.A.D. was "supposed to be on Pulmicort," that the record contained a one-year gap in treatment from December 2008 to December 2009, with no evidence of asthma exacerbation and no medical records to show that nay occurred in 2010, and that J.A.D. appeared very healthy and sat quietly coloring at the disability hearing. (*Id.*) In this way, the ALJ articulated his analysis of the evidence, concluding that Dr. Gupta's reports were not sufficient to support a finding of disability.

J.A.D. argues that the ALJ rejected treatment evidence from Dr. Bradshaw because the Listing "did not require hospitalization." (Dkt. 13 at 14.) However, while the ALJ noted that the asthma exacerbation did not require hospitalization, there is no indication that he "rejected" this evidence. Conversely, the ALJ explained that the case file contained very little treatment evidence from 2007 to the present, and included this asthma exacerbation as part of that evidence. (Tr. at 18.) Though J.A.D. believes otherwise, the ALJ simply could not find substantial evidence in the record to support a finding of disability.

Further, J.A.D. argues the ALJ ignored Dr. Kunzer's July 2, 2008 report that J.A.D. continued to be treated with the steroid Pulmicort, which was "evidence necessary to prove disability" under Listing 103.03C2. (Dkt. 13 at 14-15.) Once again, he does not explain how this evidence proves that his impairment meets the criteria in the Listing. The ALJ discussed this instance of treatment, noting that "J.A.D. was compliant with asthma medications." (Tr. at 18.) Also, Ms. Depp testified that, at times, his regular medicine will not help his asthma, but that a five-day treatment of "other medicine" gets his asthma under control. (Tr. at 37.) Importantly, J.A.D. has not attempted to connect this evidence to the requirements of the Listing. Contrary to J.A.D.'s assertions, the ALJ discussed the evidence of J.A.D.'s asthma medications in his analysis, concluding that the impairments did not meet Listing 103.03C2. (Tr. at 19.)

Similarly, J.A.D. argues the ALJ ignored Dr. Means' findings that J.A.D. "was having problems with wheezing and that he was being treated with the steroids, Pulmicort and Prelone," which was "evidence necessary to prove disability" under Listing 103.03C2. (Dkt. 13 at 15.) In his analysis, the ALJ correctly characterized and discussed this evidence, noting that J.A.D. "had an asthma exacerbation that required 5 days of Prednisone but not hospitalization," and that "[h]e

was apparently not using Pulmicort as had been prescribed." (Tr. at 19.) In this instance, the ALJ considered evidence that both supported and undermined his overall decision.

With reference to his asthma, J.A.D. argues the ALJ ignored that he was now being treated with the steroid Flovent, which was "evidence of his wheezing" and "evidence of disability," and was "necessary to prove disability" under Listing 103.03C2. (Dkt. 13 at 15.) However, with reference to the visit with Dr. Gatewood, the ALJ noted that J.A.D. was "out of Flovent," that "[h]is mother said he used more Albuterol with weather changes and she reported he had some wheezing when playing and coughing at night." (Tr. at 19.) The ALJ did not ignore this evidence at all, but simply came to a different conclusion based on the evidence.

### b. Functionally Equaled Listing 103.03C2

J.A.D. intermittently argues that his impairments functionally equaled Listing 103.03C2. (*See* Dkt. 13 at 7, 8-9, 13, 15-16.) J.A.D.'s counsel mentions the domains twice with reference to asthma, concluding that J.A.D. was "functionally totally disabled" due to a marked to extreme limitation in the domains of moving about and manipulating objects and interacting and relating with others. (Dkt. 13 at 9, 16.) However, J.A.D. provides no analysis to support this assertion.

Conversely, the ALJ discussed each domain with reference to the evidence. (See Tr. at 21-26.) In his discussion regarding J.A.D.'s ability to interact and relate with others, the ALJ discussed his daycare teacher's indications that J.A.D. had problems with peer relationships, along with his mother's report that J.A.D. was aggressive and did not cooperate or share with siblings and peers. (Tr. at 23.) In light of this contrary evidence, the ALJ made a decision that J.A.D. did not have a limitation in this domain. (*Id.*) With regard to moving about and manipulating objects, the ALJ found that the state agency consulting physicians were wrong to conclude that J.A.D. had no limitation in this domain. (Tr. at 24.) The ALJ gave J.A.D. "some

benefit of the doubt" based on his mother's report and the observations of his daycare teacher, finding it reasonable that asthma could cause J.A.D. to "have some shortness of breath with exertional activities." (*Id.*) Based on this evidence, the ALJ concluded that J.A.D. had less than a marked limitation in this domain. (*Id.*) However, without more, this finding alone was insufficient to support a finding of disability. *See* 20 C.F.R. § 416.926a(a). Thus, the ALJ sufficiently discussed evidence contrary to his ruling and made a decision based on that evidence. J.A.D. has provided no analysis to show why the ALJ should have reached a different conclusion on functional equivalence.

**B.      Failure to summon a medical advisor**

Next, J.A.D. argues the ALJ's failure to summon a medical advisor to testify regarding medical equivalence requires reversal of the decision. He contends that the "ALJ cited no evidence regarding medical equivalence," and instead assumed, based on his own layperson's opinion, that J.A.D.'s combined impairments did not medically equal Listings 103.3C2 or 112.11. (Dkt. 13 at 10-11.) Notably, this argument contains no reference to the evidence in this case.

An ALJ must consider an expert's opinion when determining if an impairment meets or equals a medical listing. *Barnett v. Barnhart*, 381 F.3d 664, 670 (7th Cir. 2004). However, an ALJ is not required to seek the opinion of additional medical experts; the decision to summon a medical expert is discretionary. *See* 20 C.F.R. § 416.927(e)(2)(iii); *see also Scheck*, 357 F.3d at 700 (concluding that Disability Determination and Transmittal forms conclusively establish that a physician designated by the Commissioner has given consideration to medical equivalence). Here, the ALJ based his medical equivalence decision on the medical opinion of two state agency medical consultants, both of whom concluded in Disability Determination and

Transmittal forms that J.A.D.'s asthma and renal cyst were severe but did not meet or medically equal the listings. (Tr. at 18.) Further, the ALJ is not required to "articulate [his] reasons for accepting the consulting physicians' opinions on the question of medical equivalency." *Scheck*, 357 F.3d at 701. As noted above, the ALJ's decision was not based on his own layperson's opinion; he carefully examined the consultative examinations by Dr. Gupta, the medical treatment evidence from the physicians at the Blackburn Health Clinic, the reports by J.A.D.'s mother, and the report by his daycare teacher. (Tr. at 18-19.) Thus, bolstered by his discussion of both supporting and contrary evidence, the ALJ's decision was supported by substantial evidence in the record as a whole.

## C.     Fairness and justice

J.A.D. next argues that "fairness and justice" require reversal of the decision because "it was obviously unfair for the ALJ to misstate and ignore all of the claimant's evidence proving disability." (Dkt. 13 at 8.) In the midst of his fairness argument, J.A.D. contends that the ALJ did not relate "any of the evidence proving disability to any of the elements of these Listings or domains," which failed "to build an accurate and logical bridge from all of the evidence in the record to his conclusions." (Dkt. 13 at 8-9.)

However, "perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived." *Berkowitz*, 927 F.2d at 1384; *see also D.O.B. ex rel. Dudley*, 2011 WL 3739366 at *1 n.3 (refusing to address J.A.D.'s counsel's fairness arguments because "they [were] undeveloped conclusory assertions rather than actual analysis."). J.A.D.'s arguments are undeveloped and conclusory. He fails to cite specific evidence that the ALJ ignored or mischaracterized. Further, even if the ALJ had ignored or mischaracterized evidence,

17

J.A.D. has not shown how this failure amounts to unfairness and injustice. Accordingly, the Court finds that J.A.D.'s fairness argument is waived.

**D.      Credibility determination**

Finally, J.A.D. argues the ALJ's credibility determination is reversible error because it is contrary to Social Security Ruling 96-7p, which is binding on the agency. (*See* Dkt. 13 at 18-19.) In particular, he asserts that the ALJ failed to consider the location, duration, frequency, and intensity of J.A.D.'s symptoms by ignoring the detailed behavioral evaluation by the daycare teacher. This evidence, he concludes, was sufficient to prove that he had the behavioral problems required for Listing 112.11. He also argues that the ALJ determined the credibility issue based on gaps in J.A.D.'s treatment records, contrary to Social Security Ruling 96-7p, which requires an ALJ to consider explanations for infrequent or irregular medical visits, such as the individual's ability to afford treatment, along with access to free or low-cost medical services.

However, J.A.D. has not argued the inability to afford treatment, nor a lack of access to free or low-cost medical services, as a reason for his gap in treatment. Further, J.A.D. simply asserts that the ALJ's determination on credibility was contrary to Social Security Ruling 96-7p without providing supporting analysis. This Court has found similar credibility arguments to be forfeited for lack of legal and factual development. *See Elliott v. Astrue*, No. 1:09-cv-653-SEB-DML, 2010 WL 3893801, at *6 (S.D. Ind. Sept. 29, 2010). Here, J.A.D.'s credibility argument is undeveloped and conclusory.

Nevertheless, the ALJ did not base his credibility determination solely on the gap in treatment, but rather upon conflicts between Ms. Depp's testimony and the objective medical evidence. (Tr. at 20.) The ALJ stated as an example that in March 2008, when J.A.D. was

treated for conjunctivitis, his mother reported that he has asthma *only* when the weather changes. (Emphasis added). As required, the ALJ indicated that in making findings on the credibility of statements he did so based on a consideration of the entire case record. Therefore, the ALJ's credibility determination was not patently erroneous.

## V. CONCLUSION

For the reasons discussed above, the ALJ's decision must be **AFFIRMED.**


**SO ORDERED.**


Date: 03/21/2013 _____

_____
Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana


DISTRIBUTION:

Patrick Harold Mulvany
patrick@mulvanylaw.com

Thomas E. Kieper
OFFICE OF THE UNITED STATES ATTORNEY
tom.kieper@usdoj.gov